## STA–FRESH PRODUCTS, Inc., v. AVOSET, Inc., et al.

### No. 2301.

District Court, E. D. Pennsylvania.

July 13, 1942.

Synnestvedt & Lechner, Harvey L. Lechner, and Edward Hugh Davis, all of Philadelphia, Pa., and Lines, Spooner & Quarles and Chas. B. Quarles, all of Milwaukee, Wis., for plaintiff.

Lester B. Johnson, of Philadelphia, Pa., for defendant Avoset, Inc.

Robert T. McCracken, of Philadelphia, Pa., and William Doll, of Milwaukee, Wis., for defendant Grindrod.

KIRKPATRICK, District Judge.

This is an action for a declaratory judgment to settle a controversy between Sta-Fresh, the plaintiff, and Avoset, one of the defendants, arising from licenses granted each of them by Grindrod, the other defendant, under a patent for a process for sterilizing cream and milk products. Avoset's license is to use the process and sell the product anywhere in the United States, and is exclusive except that it contains the following reservation:

"This license agreement is subject to all the terms and conditions of any options and license agreements heretofore executed by Grindrod and which may be now outstand-

ing, and which in any way impair or affect the license herein granted. Grindrod shall, at the time of the execution of this agreement, deliver to Real Cream certified copies of all such options and agreements; and Grindrod covenants that the copies of options and agreements so delivered shall be all of such options and agreements outstanding at the time of the execution of this agreement which in any way impair or affect the license herein granted."

Specifically the question which the Court is asked to answer is whether Sta-Fresh, which claims to have succeeded to the rights so reserved, and now proposes to build a sterilization plant in Florida and sell the products throughout the United States, has the right to do so.

Avoset's license (dated July 12, 1940) was executed on July 16, 1940, which may be taken as the determinative date. When Avoset (then called Real Cream Incorporated) executed the license agreement, Grindrod had delivered to it certain papers embodying an agreement between Grindrod and one Ferris (Sta-Fresh's predecessor in title), consisting of a formal contract and subsequent letters modifying it. These documents (which it will be convenient to refer to as the Ferris documents) gave Ferris certain rights under the Grindrod patent, and included an option, which Ferris might exercise upon complying with specified conditions, to take a license to manufacture in Florida, the exercise of which Avoset is resisting.

Avoset contends: (1) That all Ferris's rights in respect of the Grindrod patent terminated because of the failure of Grindrod and Ferris to enter into a definitive contract, as contemplated by the Ferris documents, within the time specified for such completion (July 15, 1940) and that, having granted to Avoset an exclusive license amounting in effect to a transfer of the patent monopoly, Grindrod was, after July 16, without power to reinstate Ferris's lapsed rights by extending the time for the completion of the contract; (2) That even if Grindrod had the power to reinstate Ferris's lapsed rights, it has never done so, the contract finally consummated between Grindrod and Ferris on September 18, 1940, being in certain particulars more favorable to Ferris than the corresponding terms in force prior to July 16 and disclosed by the Ferris documents, and consequently a different contract, ineffective and fraudulent as against Avoset.

The practical interest of Avoset in the situation is apparent. Proceeding under its license it has provided for the construction of a processing plant in California, has invested money and has been manufacturing and selling under the license. If Sta-Fresh may sell anywhere in the United States products processed by it in its proposed plant in Florida, Avoset will have considerably more competition that if Sta-Fresh is limited to selling in Florida the production of Grindrod's comparatively small plant, which, it contends is all that Grindrod had the right to give Sta-Fresh.

We may accept provisionally Avoset's contention that, if at some time after July 16, 1940, Ferris ceased to have any right whatever in respect of the proposed plant in Florida, then it was beyond the power of Grindrod to create new rights at a later date under the guise of merely extending existing ones.

The whole question turns upon a correct understanding of exactly what the entire contract between Grindrod and Ferris was on July 16, 1940. I am making separate findings of fact which embody the Ferris documents, and it will not be necessary to do more than summarize them here.

Ferris had, first of all, a contract dated December 22, 1939, which provided that he should run a sales test in Florida for a period of six months, and that, by notifying Grindrod, he might acquire the right either (a) to use the process to manufacture cream and milk products, under a form of license attached, in a sterilization plant to be installed by him in Florida or (b) to install a plant elsewhere than in Florida and to sell in Florida, the processed cream produced by it. He had on June 22 notified Grindrod that he would proceed under (b). Then came three letters, one of June 27 and two of July 8, which made certain modifications in the agreement. The net result of these letters was that Grindrod agreed that Ferris need not build the "elsewhere than in Florida plant" but that it would be provided by Grindrod; that a "production" contract defining the terms under which Grindrod was to produce and sell sterilized cream and milk products to Ferris for sale by him in Florida would be completed on or before July 15; and in addition to the foregoing, that at any time, so long as this proposed "production contract" was in effect, Ferris might change back to the (a) option, and install his own plant in Florida, in which case he would have the

right to sell milk and cream products from such plant anywhere in the United States.

Sta-Fresh's determination now to take the course last mentioned is the thing which has produced this controversy. Avoset's contention that the right to do so has lapsed depends upon the fact that no "production" contract (on the existence of which the right was predicated) was completed on or before June 15 as provided in the Ferris documents.

If the Ferris documents had been certified to Avoset without anything else, Avoset's position might be maintainable. However, in transmitting them to Avoset, Grindrod wrote a letter (July 15) in which it said, "It is understood that the final draft of the production contract * * * is not completed but that such a contract embodying the terms agreed upon and included in letters (the Ferris documents submitted to Avoset) * * * will be signed by us." As has been stated, a production contract was finally drawn up and executed on September 18, 1940, and it is a fact that its terms did embody substantially the terms set forth in the letter contract of July 8. Avoset when it took its license was thus fully advised that the production contract had not been completed but would be executed at some future unspecified date. Nor was the actual execution unreasonably postponed. I do not think that a delay of two months is sufficient to have caused a lapse, even if one of the parties to the contract were claiming that it had lapsed. I am, therefore, of the opinion that the fact that the production contract was not executed on July 15 and not until September 18 did not cause Ferris's right to lapse, and that there was consequently no reinstatement or creation of new rights by Grindrod.

Passing from the "time lapse" question, Avoset's other point is that the contract of September 18 departed in some particulars from the contract which subsisted between Grindrod and Ferris of July 16 of which Avoset was informed when it took its license. Consequently, the argument is, Ferris's rights lapsed not only by reason of delay but because they have never been taken up, those which are now asserted by Sta-Fresh being entirely different.

In Grindrod's letter of June 27, 1940 (one of the Ferris documents) it was stated "that the proposed production contract is to contain certain provisions as follows * * (b) minimum sales volume schedule upon which is to be predicated the continuance of the exclusive right to sell the specified cream and milk products in the State of Florida." Thus it will be seen that the minimum which Ferris had to pay in order to keep alive his right to a manufacturing license had not been fixed when Avoset took its license. Avoset knew that, and, of course, waived notice of exactly what they would be. The only change in royalties of which Avoset did not have notice was in the minimum to be required to be paid after the installation of the plant in Florida. The reductions in the minimum royalties are quite substantial, but it should be noted that the royalty itself based on percentage of sales was not reduced.

The letter of August 17, 1940, signed by both Grindrod and Ferris contains a promise on the part of Grindrod that if Ferris establishes a plant in Florida, milk and ice cream mix will be "added" to the licensed products. The original contract of December 22, 1939, of which Avoset had notice did contemplate milk as well as cream. Ice cream mix, of course, contains the processed cream product and it was hardly necessary to treat it separately at all. At any rate it was a small item, and apparently the parties have not pressed its addition as a serious consideration. The contract of September 18 merely says that milk and ice cream mix will be added nonexclusively, and exclusively only "if mutually satisfactory minimums can be agreed upon." The manufacturing license does not include either of them and, so far as appears, it is not at present proposed to extend the scope of the license to include ice cream mix.

To sustain Avoset's position in respect of the reduction of minimum royalties it seems to me that it would have to appear not only that the change is substantial but that the intrusion of Ferris into the terrain of Avoset's exclusive license has been substantially extended beyond that which it could reasonably have anticipated. Does this appear?

As has been stated, the Ferris documents contemplate that under certain conditions Ferris might obtain the right to manufacture in Florida and sell anywhere in the United States. Thus Avoset had fair notice that its monopoly could be invaded to that extent, and it had no reason to believe that it would not be. Avoset does not contend that it contracted with Grindrod in the belief, expectation or hope that Fer-

450

ris would be compelled by the severity of the conditions imposed to default. In fact it appears from the terms of the original option agreement, on which Avoset is relying, that a default in payment of the minimum after Ferris had installed a plant in Florida would not give Grindrod the right to revoke the license but would only result in the forfeiture of its exclusive feature. Thus, under strictest adherence to the terms as Avoset understood them on July 16, competition from Ferris could not be entirely eliminated, though default might give Avoset the right to manufacture in competition with him in Florida also a right which, so far as there is evidence, it does not assert. Whatever Ferris's financial status, Avoset knew that the contract was assignable and could anticipate that if the product proved a success capital would be forthcoming. The plain fact is that it had no right whatever in view of the information in its possession on July 16 to count upon ever having an exclusive right to sell in the United States outside of Florida free from competition from Ferris or his assigns. Certainly, any lawyer advising Avoset would have told it that it would not be justified in making an investment on any theory that it would.

I should think that Avoset might have the right to complain if the scope of Ferris's license had been materially extended; for example, if there had been added the right to build plants in, say, California and Illinois, thus putting Ferris in position to compete everywhere on an equality with Avoset.. But the final contract does not give Ferris any broader territorial rights than those of which Avoset had notice. The complaint is that the conditions under which such rights can be held have been made somewhat easier. In other words, it is not complaining of any extension of Ferris's rights but of a reduction in his obligations.

█ It is not hard to see where this argument would lead. It would mean that even after Ferris had installed its plant in Florida and made its investment and gone into production, Avoset could step in to prevent Grindrod from waiving the slightest default in payment of royalties or from extending the time for payment of them or making any of the mutual accommodations which are often found reasonable and necessary by parties in like situations. It would practically take the license agreement out of Grindrod's hands and turn it over to Avoset for all purposes of enforcement and give Avoset the right to wipe out Ferris' business for a reason that might be of little or no moment to Grindrod. It is to be kept in mind that Avoset is not asking the Court merely to limit Sta-Fresh's rights (for example to declare that its default of payment of the original minimum royalty its license will become nonexclusive) but to destroy them altogether and so eliminate potential competition which it must have reckoned upon when it took the license. I am of the opinion that Avoset's position can not be sustained and that Sta-Fresh has the right to proceed to manufacture in Florida within the terms of the contract of September 18, 1940.

### Conclusions of Law.

#### Plaintiff's Requests.

I affirm 1, 2, 4, 5, 6, 8, 9, 10. I deny 3. I affirm 7 with the qualification that the specific terms of the contract of September, 1940, do not affect Avoset to an extent which would give it the right to prevent the right of carrying out of that contract. I deny 11 treating it as a fact request, and deny 12 because I do not think the circumstances require an award of damages and an accounting.

#### Defendant's Requests.

I deny all the defendant's requests for conclusions of law.